[Cite as *State v. Pelmear*, 2022-Ohio-1534.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

State of Ohio/Archbold Village      Court of Appeals No.  F-21-003
                   F-21-006
         Appellee

                           Trial Court No.  TRD2000479A
                                       CRB2000052

v.

Douglas Pelmear          **DECISION AND JUDGMENT**

         Appellant          Decided:  May 6, 2022

* * * * *

Robert W. Bohmer, Archbold Village Prosecutor, for appellee.

John F. Potts, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This is a consolidated appeal from the judgments of the Fulton County Court, Western District, following a jury trial wherein appellant, Douglas Pelmear, was found guilty of one count of falsification, one count of obstructing official business, and one count of fictitious license plates.  For the reasons that follow, we reverse.

## I. Facts and Procedural Background

{¶ 2} Appellant was charged by criminal complaint with one count of falsification in violation of R.C. 2921.13(A)(3), a misdemeanor of the first degree; one count of obstruction of official business in violation of R.C. 2921.31(A), a misdemeanor of the second degree; and one count of fictitious license plates in violation of R.C. 4549.08(A)(1), a misdemeanor of the fourth degree.[1] The matter ultimately proceeded to a jury trial.

{¶ 3} At the trial, Archbold Police Patrolman Isaac Brenneman testified for the state. Brenneman testified that on February 23, 2020, he executed a traffic stop on appellant's adult son, Noah Pelmear. Brenneman cited Noah for driving without a valid driver's license. During the traffic stop, Noah expressed that he did not want the car to be towed because the car belonged to his sister. Brenneman, as a favor to Noah, agreed to let Noah contact a licensed driver to come retrieve the car. Brenneman waited at the scene for the licensed driver to appear.

{¶ 4} Sometime thereafter, appellant arrived in a maroon Cadillac with a female companion, identified as "Jennifer." Jennifer recorded the incident, and the video was played at the trial. In the video, appellant can be seen approaching Brenneman and asking for everyone to stay and to be identified as witnesses. Brenneman informed appellant that the other officer who was present, Archbold Police Patrolman Sanchez, had

---

[1] Appellant was also charged with not having an operator's license in violation of R.C. 4510.12(A)(1), but that charge was dismissed at the trial.

a call of a dog fight that he had to respond to.  Jennifer then approached Sanchez and repeatedly asked for his business card.  Sanchez provided the card, and then left the scene.

{¶ 5} Meanwhile, appellant can be heard in the background informing Brenneman that he is a "Minister of State of the Cherokee Nation of Indians," and that he is involved in a federal lawsuit against Archbold.  Appellant claimed that the encounter was "harassment," and demanded that Brenneman describe the probable cause that allowed Brenneman to conduct the traffic stop on Noah.  Brenneman responded that he was not going to discuss the matter with appellant because Noah was an adult and it was an open investigation.  Brenneman then encouraged appellant to bring any of his documentation to Noah's court date, to which appellant replied, "You understand I'm minister of state." Appellant further repeated that there is a federal lawsuit in the United States Supreme Court.  In addition to further protestation from Jennifer that it was a United States Supreme Court Case, and her recitation of the court docket number, appellant also remarked to Brenneman that Brenneman has an obligation to comply with U.S. law, and that failure to comply could result in up to three months in prison for Brenneman.

{¶ 6} Appellant then attempted to provide documentation to Brenneman showing that he was "minister of state" and claiming that it also applied to Noah.  Brenneman refused to take the documentation because the traffic stop did not involve appellant. After further back and forth between Brenneman, appellant, and Jennifer—in which

3.

Brenneman again encouraged appellant to bring any documentation with him to court because Brenneman was "not a judge"—Brenneman attempted to end the encounter by asking if one of them would take Noah's car, commenting that he just needed a licensed driver. Appellant then responded that there are no licenses "because we're Cherokee," and encouraged Brenneman to run the license plate on the Cadillac. When Brenneman directly asked appellant whether he had a driver's license on him, appellant pointed Brenneman to the documentation and a badge that said that he is "Cherokee Nation of Indians Minister of State." Appellant then claimed that he does not need a driver's license.

{¶ 7} At this point, Brenneman clarified that neither appellant nor Jennifer had an Ohio driver's license. Brenneman then instructed Noah to pull his car into a nearby parking lot. After Noah began walking to his vehicle, Brenneman informed appellant and Jennifer that they were welcome to leave the traffic stop because it did not involve them. Appellant and Jennifer retorted that the stop did involve them because Noah is under diplomatic immunity. In response, Brenneman wished appellant and Jennifer a good night, and walked away.

{¶ 8} After a few seconds, Brenneman returned to appellant and Jennifer and offered to write down his name, badge number, and any other information that they wanted, including the names of the police chief and village administrator. During this time, appellant again attempted to press his argument, but Brenneman cut him off, saying

4.

"Sir, at this point I don't care, okay. The traffic stop is over. My job here is done. I'm just trying to give you information." The video then continued for approximately two more minutes while Brenneman was writing down information, with limited interaction between appellant and Brenneman.

{¶ 9} During his testimony, Brenneman testified that appellant's actions impaired his timing in ending the traffic stop and responding to the call of a dog fight. Brenneman admitted that he had completed all of the paperwork for the traffic stop by the time that appellant arrived, but he testified that he was unable to end the stop because appellant and Jennifer did not allow him to determine whether a licensed, valid driver was going to take Noah's vehicle. Brenneman testified that he was only able to end the stop after instructing Noah to move the vehicle into a nearby parking lot so that it would no longer be obstructing the roadway. Brenneman testified that he then attempted to leave to respond to the dog fight call, but voluntarily came back to make sure that appellant had all of the information that he wanted.

{¶ 10} Additionally, Brenneman identified the license plate on the maroon Cadillac that appellant was driving. The license plate had a symbol on the left side, and at the top it read "Cherokee nation of Indians." The bottom of the license plate said "Cherrokees in America" above the word "Permanent." Brenneman noted that "Cherrokees" on the bottom of the plate was spelled with two "Rs". Brennamen testified that after the encounter he ran the license plate number through LEADS and it came back

5.

with no results, which Brennamen explained typically meant that it was not an accurate plate or it had no registration with it.

{¶ 11} Brenneman also testified that he reached out to the Cherokee Nation Tribe out of Oklahoma to see if they could identify appellant. Over the objection of appellant, Brenneman testified that he did not receive any information that would lead him to believe that appellant was a recognized diplomat or official of that tribe.

{¶ 12} The state next called Archbold Police Officer Jerry Brown. Brown testified that he was tasked with investigating appellant's claims of diplomatic immunity. As part of his investigation, Brown contacted the Cherokee Nation Marshal Service to verify that the license plates were valid. Over appellant's objection, Brown testified that he "spoke with them and the plates were not verified by -- were (not) able to be verified."

{¶ 13} Brown next testified that he spoke with the three Cherokee tribes that are federally recognized. He further stated that after receiving information back from those tribes, there was no verification that appellant was a minister of the Cherokee Nation or that appellant's license plates were valid. Brown further testified that if he had learned through his investigation that the plates were indeed valid, that he would have reported such a fact, and charges would not have been brought against appellant.

{¶ 14} On cross-examination, Brown affirmed that his investigation consisted of communications with other individuals, and that the foundation for his testimony was the information that he received from those other individuals. Brown acknowledged that he

6.

was not the keeper of the records for the Cherokee Nation of Indians, and he conceded that those individuals were not present in the court to provide sworn testimony. Brown admitted that he was "just relaying information from someone else who claimed to be what they say they are," but did emphasize that the person he received the information from was a "verified source."

{¶ 15} Following Brown's testimony, the state rested its case. Due to Covid-19 restrictions, the proceedings continued in the jury room, outside of the presence of the jurors, for the admission of exhibits. The audio recording of what occurred in the jury room was not able to be fully transcribed, and the transcript resumed with appellant's presentation of evidence.

{¶ 16} Appellant testified on his own behalf. Appellant testified that he approached Brenneman at the scene of Noah's traffic stop because he wanted to inform Brenneman of the existing federal lawsuit and wanted to see if Brenneman was tampering with a witness to that lawsuit. Appellant believed that his son was targeted by Brenneman because of the ongoing lawsuit.

{¶ 17} As to his claim of being Minister of State of the Cherokee Nation of Indians, appellant testified that Officer Brown did not speak to anyone in appellant's tribe. Appellant further reiterated that he did not provide any false information to Brenneman.

7.

{¶ 18} Finally, appellant explained that the word "Cherrokee" on his license plate was intentionally spelled that way because the original spelling of Cherokee in some of the treaties has a double "r".

{¶ 19} On cross-examination, appellant identified a copy of his license plate that was submitted as evidence. In addition, despite issues with the quality of the copied exhibit, appellant identified his photographic identification which purports to be from the "Cherokee nation of Indians" and identifies him as an "Aniyvwiya Tribal Country Member."

{¶ 20} Appellant also was led through an explanation of his federal court case. Appellant originally filed a claim against approximately 80 defendants in federal court in the Northern District of Ohio. That case was dismissed by the trial court. Appellant appealed the decision to the Sixth Circuit Court of Appeals, which affirmed the dismissal. Appellant then filed a petition for certiorari in the United States Supreme Court, which was still pending at the time of Noah's traffic stop. Not long after the stop, the United States Supreme Court denied appellant's petition.

{¶ 21} Following appellant's testimony, the defense rested. The parties then gave their closing arguments, the trial court instructed the jury, and the jury retired to deliberate. Thirty-five minutes after they began their deliberations, the jury returned with a verdict of guilty on all of the counts.

**{¶ 22}** The court proceeded immediately to sentencing. The court sentenced appellant to serve a total term of 180 days in jail with 170 days suspended. The court also ordered appellant to serve one year of probation, and to pay a total fine of $1,250, plus court costs. Appellant's sentence was stayed pending this appeal.

## II. Assignments of Error

**{¶ 23}** Appellant has timely appealed his judgments of conviction, and now asserts seven assignments of error for our review:

1. It constituted error to admit hearsay testimony regarding defendant's tribal membership and status.

2. Defendant's conviction for falsification is against the manifest weight of the evidence.

3. Defendant's conviction for obstructing official business is against the manifest weight of the evidence.

4. Defendant's conviction for fictitious plates is against the manifest weight of the evidence.

5. It is (sic) constituted error not to merge the offenses of falsification and obstructing official business.

6. It is (sic) constituted plain error not to instruct the jury on the culpable mental states which constituted elements of the offenses for which

defendant was on trial and to omit definitions of the applicable culpable mental states in the jury charge.

7. Defendant did not receive effective assistance of counsel at trial.

### III. Analysis

### A. Admission of Evidence

{¶ 24} We will begin our analysis with appellant's first assignment of error. In his first assignment of error, appellant argues that the trial court erred when it allowed Brenneman and Brown to testify regarding the results of their investigation into appellant's status as a member of the Cherokee tribe. Appellant argues both that the officers lacked personal knowledge as required under Evid.R. 602, and that their testimony constituted inadmissible hearsay under Evid.R. 802.

{¶ 25} The state, on the other hand, argues that there was no inadmissible hearsay in this case. Instead, the state asserts that at no point were the officers allowed to testify as to what any person other than the officer said. The state further argues that the officers' testimony concerning the investigative process was not hearsay, relying on the principle that statements offered to explain a police officer's conduct while investigating a crime are not hearsay because they are not offered for the truth of the matter asserted. Finally, the state argues that even if the testimony was inadmissible, its admission was harmless because the evidence against appellant was overwhelming.

10.

**{¶ 26}** "Generally, '[t]he trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court.'" *State v. Kelley*, 2017-Ohio-4475, 83 N.E.3d 990, ¶ 37 (6th Dist.), quoting *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). However, the trial court's discretion must be "exercised in accordance with the rules of procedure and evidence." *State v. Moore*, 2021-Ohio-765, 168 N.E.3d 921, ¶ 26 (6th Dist.), citing *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

**{¶ 27}** Upon review, we find that Brenneman and Brown's testimony technically satisfied the fundamental requirement of personal knowledge. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Evid.R. 602. "'Personal knowledge' is '[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.'" *Bonacorsi v. Wheeling & Lake Erie Ry. Co.*, 95 Ohio St.3d 314, 2002-Ohio-2220, 767 N.E.2d 707, ¶ 26, quoting Black's Law Dictionary (7th Ed.Rev.1999) 875.

**{¶ 28}** In this case, when read closely, Brenneman and Brown's testimony was limited to their personal knowledge that their investigation did not lead to any verification of appellant's status as a minister or member of the Cherokee Nation. Specifically, Brenneman testified:

11.

Q      Okay. Now, you mentioned before that you wanted to verify if any of the claims that the defendant had made related to the validity of an ID or plates or his status, did I, did I say that correctly?

A      Correct, correct.

Q      Okay. So when you went out and called were you try (sic) to verify something he said?

A      Right. We were trying to first verify that, that he was a member of the tribe and then we were trying to verify additionally to that that he was an official representative of the tribe.

Q      From the information that you received, did you receive any information of any kind that would lead you to believe that he was a recognized diplomat or a recognized official of the tribe that you called?

A      No. (Following an interruption for a hearsay objection that was overruled). So, no, no, they -- there was no indication that he had official membership in the tribe that I contacted.

Similarly, Brown testified:

Q      What did you do next?

A      Um, from there I contacted the Cherokee Nation Marshal Service, they do investigations on behalf of the Cherokee Nation, ah --

Q      What was the purpose of contacting them?

12.

A    To verify the, the plates were valid.

Q    Okay. And in your interaction with Cherokee Nation of Indians did you acquire any information that would have led you to believe they were valid?

A    (Following an interruption for a hearsay objection that was overruled). So I spoke with them and the plates were not verified by -- were able (sic) to be verified.

* * *

Q    Proceeding forward, did you check with any other sources of information to try to determine whether the claims of Mr. Pelmear and valid license or diplomatic status were true or not?

A    Yes. Ah, later on I reached back out to the Marshal Service, spoke with a Brian Catcher of the Cherokee Marshal Service, and I got a correspondence back trying to verify membership into the Cherokee Nation in the form of a letter from that, from the tribe. (The remainder of Brown's response was withdrawn following a sustained hearsay objection).

* * *

Q    Um, Officer Brown, in your investigation did you ascertain the number of Cherokee Tribes that have treaties with the United States?

A    There are three federally-recognized tribes.

Q	Okay. And in your investigative process to determine whether any of the claims by Mr. Pelmear were true, did you correspond or speak with these three entities?

A	I did.

Q	And after receiving all the information back from those three entities did you have any basis to say that anything that he had said, that he was a minister of the Cherokee Nation, that the plates were valid, were true?

A	Correct, I did not get any verification. (Objection based on foundation and hearsay overruled).

* * *

Q	In your investigative process did you confirm with standard law enforcement sources, in terms of online sources available in law enforcement, to check whether he had a valid driving status with the plate on his car?

A	Um, the plates on his car, we checked through the State of Oklahoma, um, the BMV for that because the Cherokee Nation, they run their plates through the State of Oklahoma, and it did not come back to them. Um, I checked with, tried to verify if there's other tribes that may have valid plates, I was not able to verify anything as well.

* * *

Q    Now, in the course of your investigation had you determined that, that through one of your contacts that you made with the Cherokee Nations of Indians that the plates were valid or that he had status, would you have reported that?

A    I would have.

Q    Okay.  And you believe that you would have brought charges for it at that point had you proven that?

A    No, we would not.  If we were able to verify that his membership was valid or the license plates were valid or anything of the sort charges would not have been brought forward.

Thus, because Brenneman and Brown clearly were aware of the results of their investigative efforts, we hold that Brenneman and Brown's testimony was technically based on their personal knowledge.

{¶ 29} Likewise, we find that the testimony of Brenneman and Brown technically did not constitute inadmissible hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  In this case, Brenneman and Brown carefully crafted their testimony to avoid repeating statements made by their sources during the investigation into appellant's tribal status.  Instead, Brenneman and Brown

obliquely testified that they did not receive any information or verification that could lead them to conclude that appellant was a minster or member of the Cherokee Nation.

{¶ 30} Therefore, because Brenneman and Brown did not lack personal knowledge of the specific matters to which they testified, and because they did not testify regarding out of court statements made by another person, we hold that the trial court did not err in denying appellant's objections on the basis of lack of foundation and hearsay.[2]

{¶ 31} Accordingly, appellant's first assignment of error is not well-taken.

### B. Sufficiency and Manifest Weight

{¶ 32} In his second, third, and fourth assignments of error, appellant challenges his convictions as being against the manifest weight of the evidence. When reviewing the claim that a verdict is against the manifest weight of the evidence, "we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest

---

[2] Notably, appellant did not object to the testimony on the grounds of relevance under Evid.R. 402, or unfair prejudice under Evid.R. 403(A).

16.

weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 33} Although appellant labels his assignments of error as being that the convictions are against the manifest weight of the evidence, appellant essentially argues within his brief that there is no evidence to support his convictions, thus raising a claim that his convictions are based on insufficient evidence. *See State v. Frum*, 9th Dist. Wayne No. 12CA0039, 2013-Ohio-1096, ¶ 4 ("[A] review of the weight of the evidence necessarily involves an evaluation of the sufficiency of the evidence in that, in order for this Court to weigh the evidence, there must be evidence to weigh."). When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 34} For ease of discussion, we will address appellant's assignments of error out of order.

### 1. Falsification

{¶ 35} Appellant's second assignment of error focuses on his conviction for falsification under R.C. 2921.13(A)(3), which provides, "No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies:  * * * (3) The statement is made

with purpose to mislead a public official in performing the public official's official function."

{¶ 36} The issue in this appeal is whether appellant made a false statement. In support of his assignment of error, appellant identifies that the only evidence admitted to show that his claims of being a member and minister of state for the Cherokee Nation were false, was the testimony of Brenneman and Brown. Importantly, however, Brenneman and Brown did not testify that appellant was not a member or Minister of State for the Cherokee Nation. Indeed, Brenneman and Brown could not testify as such because they lacked personal knowledge regarding whether appellant was part of the Cherokee Nation, and because they could not repeat the hearsay statements of their sources. Instead, Brenneman and Brown simply testified that they were unable to verify that appellant's claims were true. Upon review, we hold that Brenneman's and Brown's testimony is insufficient to support a conviction for falsification.

{¶ 37} It should go without saying that a foundational aspect of our criminal justice system is that "Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution." R.C. 2901.05(A). Applied to the present charge for falsification, this means that the state bore the burden of proving that appellant's statements were false—even statements as facially absurd as appellant's claim that he is Minister of State for the Cherokee Nation. Here, however, instead of providing evidence

18.

that appellant was not Minister of State for the Cherokee Nation from someone who had personal knowledge of the Cherokee Nation's officers and members, the state provided the inverse testimony that appellant's claims could not be verified as true. Thus, in essence, the state provided no evidence at all. To hold that Brenneman's and Brown's testimony is sufficient to support appellant's conviction for falsification would turn the presumption of innocence on its head; rather than appellant being innocent until proven guilty, appellant would be guilty because the officers could not verify that he was innocent. Therefore, because the state failed to present any evidence demonstrating that appellant made a false statement, we hold that his conviction for falsification is based upon insufficient evidence.

{¶ 38} Accordingly, appellant's second assignment of error is well-taken.

## 2. Fictitious Plates

{¶ 39} In his fourth assignment of error, appellant challenges his conviction for fictitious plates under R.C. 4549.08(A)(1), which provides,

> (A) No person shall operate or drive a motor vehicle upon the public roads and highways in this state if it displays a license plate or a distinctive number or identification mark that meets any of the following criteria:
>
> (1) Is fictitious.

19.

{¶ 40} As with its prosecution of the falsification charge, the state relied upon testimony from Brenneman and Brown to establish that appellant's license plates were fictitious. In addition to the testimony recounted above, Brenneman testified,

Q      The -- first of all in your investigation did you do any checking on whether the plates on Mr. Pelmear's car were valid, official government, police --

A      Correct.

Q      And how did you do that?

A      So we ran the plate number through LEADS the same as we would every plate that we came across and it comes back to no plate found, um, which typically means that it's not an accurate plate, it's not registered or it has no registration with it. Um, I then went through our old reports, um, through the Village of Archbold to find additional information, driver's license number or social security number for Mr. Pelmear. He was in our system, ran his information and he came back to not having a valid license.

* * *

Q      Okay. * * * You looked at the official police investigative techniques to determine whether his plates were valid or not?

A      Correct.

Q      And they came back as?

A        No plate found, not valid.

{¶ 41} Notably, Brenneman's testimony regarding the license plates differs from his testimony regarding appellant's status as a member of the Cherokee Nation.  As discussed above, as it relates to appellant's status as a member of the Cherokee Nation, Brenneman simply testified that he was unable to verify appellant's claims—Brenneman did not testify that appellant was not a member.  In contrast, as to whether appellant had fictitious plates, Brenneman testified affirmatively that he consulted LEADS, and that LEADS reported "no plate found," which Brenneman explained "means that it's not an accurate plate, it's not registered or it has no registration with it."  Thus, based upon Brenneman's testimony regarding the results of the LEADS inquiry, we find that appellant's conviction for fictitious plates is supported by sufficient evidence.[3]

{¶ 42} Nevertheless, we hold that appellant's conviction for fictitious plates must be reversed because the trial court committed plain error when it permitted Brenneman to testify to the contents of the LEADS report where the LEADS report was not offered into evidence.

{¶ 43} At the outset, we note that appellant did not object to Brenneman's testimony regarding the LEADS report.  "Absent plain error, failure to object to the admission of hearsay evidence waives any claim of error."  *State v. Rios*, 6th Dist.

---

[3] We note that Brown's testimony regarding his inquiry into the validity of appellant's license plates does not support appellant's conviction because, as with his testimony on appellant's status as a member of the Cherokee Nation, Brown simply testified that he was unable to verify appellant's license plates.

Williams No. WM-13-004, 2014-Ohio-341, ¶ 32, citing *State v. Santiago*, 10th Dist. Franklin No. 02AP-1094, 2003-Ohio-2877, ¶ 11. "Plain error is error that affects an appellant's substantial rights." *State v. Magee*, 2019-Ohio-1921, 136 N.E.3d 800, ¶ 25 (6th Dist.), citing Crim.R. 52(B). "An appellate court 'may recognize plain error, sua sponte, to prevent a miscarriage of justice.'" *Id.*, quoting *State v. Vinson*, 2016-Ohio-7604, 73 N.E.3d 1025, ¶ 66 (8th Dist.). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶ 44} Here, Brenneman's testimony as to the results of the LEADS inquiry constitutes a textbook example of hearsay in that he repeated an out-of-court statement made by LEADS, and offered it for the truth of the matter asserted, namely that appellant's license plate was not registered. In fact, the LEADS report itself is hearsay, although we and others have held that it is admissible under the public records exception to the hearsay rule found in Evid.R. 803(8)(a). *State v. Price*, 6th Dist. Erie No. E-19-003, 2020-Ohio-220, ¶ 13, citing *Cleveland v. Craig*, 8th Dist. Cuyahoga No. 99619, 2013-Ohio-5742, ¶ 37. Thus, generally, an officer's testimony regarding the results of the LEADS inquiry would be harmless where the LEADS report itself was entered into evidence.[4] In this case, however, the state never introduced the LEADS report.

---

[4] "As a public record, a LEADS report requires authentication prior to being admitted into evidence, pursuant to Evid.R. 901(B)(7). While extrinsic evidence of authenticity is

22.

Therefore, because the only evidence supporting appellant's conviction for fictitious plates is Brenneman's testimony, and because Brenneman's testimony on this matter constitutes inadmissible hearsay, we hold that the trial court committed plain error when it permitted Brenneman to testify regarding the results of the LEADS inquiry.[5]

{¶ 45} Accordingly, appellant's fourth assignment of error is well-taken, in part.

### 3. Obstruction of Justice

{¶ 46} Finally, in his third assignment of error, appellant challenges his conviction for obstruction of justice under R.C. 2921.31(A), which states,

> No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

{¶ 47} In order to prove the charge of obstructing official business under R.C. 2921.31(A), the state must prove the following five essential elements: "'(1) an act by

---

not required for certified copies of public records, as they are self-authenticating pursuant to Evid.R. 902(1), (2) and (4), a seal must accompany the certification before the certified copy is considered self-authenticating." *Price* at ¶ 13, citing *State v. Peterson*, 11th Dist. Trumbull No. 96-T-5456, 1996 WL 761231, *6 (Nov. 29, 1996).

[5] "When evidence admitted at trial is sufficient to support a conviction, but on appeal, some of that evidence is determined to have been improperly admitted, the Double Jeopardy Clauses of the United States and Ohio Constitutions will not bar retrial." *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, syllabus.

23.

the defendant, (2) done with the purpose to prevent, obstruct, or delay a public official, (3) that actually hampers or impedes a public official, (4) while the official is acting in the performance of a lawful duty, and (5) the defendant so acts without privilege.'" *Brooklyn v. Kaczor*, 8th Dist. Cuyahoga No. 98816, 2013-Ohio-2901, ¶ 7, quoting *State v. Kates*, 169 Ohio App.3d 766, 2006-Ohio-6779, 865 N.E.2d 66, ¶ 21 (10th Dist.).

**{¶ 48}** In support of his assignment of error, appellant argues, inter alia, that the state failed to produce evidence that he hampered or impeded a public official. Ohio courts have recognized that "there must be some substantial stoppage of the officer's progress before one can say he was hampered or impeded." *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 17 (1st Dist.), quoting *State v. Stephens*, 57 Ohio App.2d 229, 230, 387 N.E.2d 252 (1st Dist.1978). "The statute does not criminalize every 'minor delay, annoyance, irritation or inconvenience.'" *State v. Whiting*, 6th Dist. Lucas Nos. L-17-1133, L-17-1247, 2019-Ohio-56, ¶ 44, quoting *State v. Vitantonio*, 2013-Ohio-4100, 995 N.E.2d 1291, ¶ 14 (11th Dist.). "Rather, a conviction requires 'evidence that a defendant actually interfered with the performance of an official duty and made it more difficult,' but does not require evidence that the defendant successfully prevented the performance of an official duty." *Id.*, quoting *State v. Standifer*, 12th Dist. Warren No. CA2011-07-071, 2012-Ohio-3132, ¶ 28.

**{¶ 49}** Here, appellant could not have hampered or impeded Brenneman's ability to issue a traffic ticket to Noah because, by the time appellant arrived on the scene, the

24.

ticket had already been completed. Instead, the state argues that appellant's protestations prevented Brenneman from ending the traffic stop. However, we note that Brenneman had already elected to prolong the stop by allowing Noah to contact someone to come and pick up his vehicle. Thus, while Brenneman's decision to not have the car towed was gracious—and his overall demeanor and professionalism was commendable throughout the entire incident—we cannot say that he was substantially hampered or impeded from ending the stop by the momentary encounter with appellant. We find this to be particularly true here because it was appellant's lack of an Ohio driver's license, and not his act of arguing, that prevented Brenneman from sending the car with appellant. Therefore, even when viewed in the light most favorable to the state, the evidence does not demonstrate that Brenneman was hampered or impeded in the performance of his official duties. Accordingly, we hold that appellant's conviction for obstruction of justice is based upon insufficient evidence.

{¶ 50} Appellant's third assignment of error is well-taken.

## C. Other Assignments of Error are Moot

{¶ 51} In light of our resolution of appellant's second, third, and fourth assignments of error, appellant's fifth assignment of error (pertaining to the merger of the offenses of falsification and obstruction), sixth assignment of error (pertaining to the jury instructions on the offenses of falsification and obstruction), and seventh assignment of

25.

error (pertaining to the ineffective assistance of trial counsel) are rendered moot, and are not well-taken.

## IV. Conclusion

{¶ 52} For the foregoing reasons, we find that substantial justice has not been done the party complaining, and the judgments of the Fulton County Court, Western Division are reversed and vacated. In particular, the convictions for falsification and obstruction of justice, having been found to have been based upon insufficient evidence are hereby reversed and vacated, and those charges are ordered to be dismissed. The conviction for fictitious plates is also reversed, and the matter is remanded to the trial court for further proceedings on that charge consistent with this decision. The parties are ordered to share the costs of this appeal evenly pursuant to our discretion under App.R. 24(A).

{¶ 53} The clerk is instructed to serve appellant, Douglas Pelmear, with a copy of this decision at his last known address.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

26.

Mark L. Pietrykowski, J.                            _____
                                                      JUDGE

Gene A. Zmuda, J.

                            _____

Myron C. Duhart, P.J.                            JUDGE
CONCUR.

                            _____
                                                      JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.